NATIONAL GEAR & PISTON, INC., Plaintiff,

v.

CUMMINS POWER SYSTEMS, LLC and Cummins Inc., Defendants.

Case No. 10–CV–4145 (KMK).

United States District Court, S.D. New York.

May 17, 2012.

George Phillip McKeegan, Esq., Andrew James Cavanaugh, Esq., McKeegan & Shearer, P.C., New York, NY, for Plaintiff.

Michael K. Madden, Esq., Michael J. Volpe, Esq., Megan Hope Mann, Esq., Michael Colbert Hartmere, Esq., Venable LLP, New York, NY, for Defendant Cummins Power Systems, LLC.

Amanda Lynn Devereux, Esq., Samuel Goldblatt, Esq., Nixon Peabody LLP, New York, NY, for Defendant Cummins Inc.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

National Gear & Piston, Inc. ("Plaintiff") brings this action against Cummins Power Systems, LLC ("CPS") and Cummins Inc. ("Cummins") (collectively, "Defendants"). Plaintiff alleges breach of contract, breach of the duty of good faith and fair dealing, tortious interference with contract, tortious interference with business relations, and violation of Section 340(1) of the New York General Business Law ("the Donnelly Act"). Defendants separately each move to dismiss all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained herein, Defendants' motions are granted.

1. CMP was acquired by CPS in April 2008.

## I. Background

### A. Plaintiff's Allegations

For purposes of deciding the instant motions, the Court assumes the truth of Plaintiff's allegations in its Amended Complaint. Plaintiff is a New York corporation which supplies and services "essential automotive components" for public agencies, including the New York State Department of Transportation ("NYSDOT"), Metropolitan Transit Authority ("MTA"), and the New York City Transit Authority ("NYCTA"). (Am. Compl. ¶ 6.) A major part of its business is the sales of engines and engine parts manufactured by Cummins, which allegedly manufactures the only mass transit bus engines that comply with EPA regulations. (*Id.* ¶¶ 9, 24.) Plaintiff has sold these engines since 1998 as an authorized Cummins dealer, first under the territory distributor Cummins Metropower, Inc. ("CMP"), then under its successor, CPS.[1] (*Id.* ¶¶ 7–8.) As an authorized dealer representative, Plaintiff has "developed customer relationships; offered for sale components and materials required by customers; set pricing and payment terms for such sales; acquired from [Defendants] inventory to fulfill orders actually placed, and provided after-sale service and information to customers." (*Id.* ¶ 18.) Plaintiff "has developed a significant business reputation as a lead trading partner with local transit agencies in connection with the procurement of [Cummins] machinery and materials ... built on a history of competitive bidding, fair dealing and customer service." (*Id.* ¶ 22.)

Cummins is an Indiana corporation and "a major provider of automotive components utilized in the general purpose truck and revenue transit sectors." (*Id.* ¶ 7.) CPS is a Delaware limited liability company that is a territory distributor for Cummins. (*Id.* ¶ 8.) CPS, and before it CMP,

(Am. Compl. ¶ 21.)

acted as an upstream distributor to Plaintiff, maintaining a first level business-to-business relationship with Cummins for Plaintiff's benefit, acquiring inventory from Cummins and then reselling it to Plaintiff, and financing Plaintiff's inventory purchases. (*Id.* ¶ 19.) CPS, and before it CMP, also functioned as a competitor of Plaintiff, distributing Cummins products both to authorized dealers and end users, and often bidding on the same contracts on which Plaintiff and other authorized dealers were bidding. (*Id.* ¶ 20.)

In November 2007, CMP provided Plaintiff with a written agreement ("Agreement"), "setting out the respective rights and obligations of CMP as Distributor and [Plaintiff] as Dealer." (*Id.* ¶ 10.) The Agreement was allegedly originally formulated by Cummins, as the standard form used by all Cummins distributors. (*Id.* ¶ 11.) The Agreement states that it is effective "upon the date fully executed." (*Id.* Ex. A, § 7.1.) It may be terminated (1) without cause "upon 60 days' prior written notice to the other party" (pursuant to Section 7.2 of the Agreement), or (2) "at any time, without further notice, if [Plaintiff] is in breach of this Agreement, or other good cause for termination exists, and [Plaintiff] fails to cure the breach or cause within 30 days of written notification thereof from [CMP]" (pursuant to Section 7.4 of the Agreement). (*Id.* §§ 7.2, 7.4.) If the Agreement is terminated, any prior orders "shall not in any way be affected." (*Id.* § 7.6(c).)

The Agreement was never executed, and remains unsigned by either party. (Am. Compl. ¶ 17.) Plaintiff claims that the Agreement "memorialized the terms and practices of the business relationship as it had existed between the parties since 1999," and asserts that the parties "performed generally pursuant to the terms

set forth in the un-executed contract." (*Id.*)

In April 2008, CPS acquired CMP. (*Id.* ¶ 21.) Plaintiff alleges that initially CPS and Plaintiff "continued on the terms and practices of the business relationship previously established," with CPS acting as a distributor and Plaintiff acting as its authorized dealer. (*Id.*)[2] This "relationship" allegedly included preferred credit status for Plaintiff with CPS, as well as volume and unit discounts. (*Id.* ¶ 25.) Plaintiff claims, however, that "[s]ometime after the date that it acquired CMP, CPS began instituting increasingly onerous and unnecessary business constraints on [Plaintiff], depriving it of its effective operation as a dealer and designed to destroy its business model and its commercial viability." (*Id.* ¶ 26.) Plaintiff alleges that CPS made these operational changes "to constrain the ability of [Plaintiff] to bid effectively in its marketplace." (*Id.* ¶ 47.)

The first alleged change was the imposition on Plaintiff of a non-published price structure for certain components in October 2009, which allegedly impaired Plaintiff's ability to submit meaningful and actionable offers of sale in reply to customers' requests for bids. (*Id.* ¶ 27.) The second change was in December 2009, when CPS representatives allegedly instructed Plaintiff and other dealers that they were "prohibited from bidding on all MTA and NYCTA Requests for Bids covering machine components for buses." (*Id.* ¶¶ 34, 36.) According to Plaintiff, CPS representatives explained that the purpose of the prohibition was to let CPS maintain this business for itself, "at improved margins, and ultimately at greater cost for end use consumers." (*Id.* ¶ 35.) Since this prohibition, Plaintiff "has observed the overall bid activity" on MTA and NYCTA requests for bids "to be

---

**2.** Plaintiff alleges that CPS never tendered a written agreement to Plaintiff different from the Agreement proffered by CMP. (Am. Compl. ¶ 21.)

considerably diminished." (*Id.* ¶ 37.) Plaintiff initially complied, and refrained from bidding on the relevant contracts, but "[s]hortly thereafter" resumed bidding. (*Id.* ¶ 39.) Plaintiff's first new major bid was to provide Bosch injectors to NYCTA. (*Id.* ¶ 40.) CPS also bid, but Plaintiff won the contract, which allegedly "resulted in a substantial loss to CPS." (*Id.* ¶¶ 42, 44.) While Plaintiff normally would have obtained the Bosch injectors from CPS, due to CPS's prohibition, Plaintiff instead obtained the injectors directly from Bosch. (*Id.* ¶ 41.)

The third alleged change occurred in January 2010, and concerned a different NYCTA bid. In October 2009, Plaintiff was the winning bidder on NYCTA's bid number 76037 for reconditioned Cummins engine parts. (*Id.* ¶¶ 28–29.) The bid request specified that all responses quote a discount from list price, which Plaintiff claims it did. (*Id.* ¶ 28.) CPS was allegedly the only bidder other than Plaintiff. (*Id.*) In January 2010, CPS allegedly communicated to NYCTA that the bid was inappropriate, "because there was no list price for reconditioned [Cummins] engine parts." (*Id.* ¶ 30.) Plaintiff claims that this information "contradicted the procedures that [Plaintiff] had used for many years in responding to [similar] Requests for Bid," and that in any case such information would customarily be provided immediately after the Request for Bid was issued, not after NYCTA had determined the low bidder. (*Id.* ¶ 31.) NYCTA then cancelled the bid, allegedly because of the information it learned from CPS. (*Id.* ¶¶ 32–33.)

The fourth alleged change occurred "[i]mmediately after the NYCTA awarded [Plaintiff] the contract for the Bosch injectors." (*Id.* ¶ 45.) In January 2010, CPS "unilaterally and without reason" altered Plaintiff's payables status "from preferred credit to COD fulfillment only." (*Id.*) Plaintiff claims that it was not "delinquent or untimely in paying its bills," and alleges that CPS changed Plaintiff's credit status as punishment for bidding on the Bosch injectors contract, despite CPS's bidding prohibition. (*Id.* ¶ 46.)

On April 14, 2010 Plaintiff received a letter from CPS proposing to terminate their distributor-dealer relationship ("Termination Letter"). (*Id.* ¶ 49.) Plaintiff claims that this letter was sent because of Plaintiff's "continued bidding on requests for proposal from its long time customers." (*Id.*) The Termination Letter stated that "[a]fter careful review" of Plaintiff's compliance with CPS's territory and customer support requirements, CPS would terminate Plaintiff's "independent dealer relationship ... effective May 16, 2010." (*Id.* Ex. B.) The stated reasons were: (1) Plaintiff violated the requirement that authorized Cummins dealers use only Cummins products for repairs when Cummins warranties are in effect; (2) Plaintiff violated the requirement that dealers in the New York City area have technicians qualified to repair midrange Cummins engines; (3) Plaintiff took "unilateral, unauthorized discounts and deductions" from CPS invoices, in "direct violation of dealer and company policies"; and (4) Plaintiff did not comply with CPS's payment terms. (*Id.*) As a result of the termination, Plaintiff would no longer be eligible for "any Dealer programs or policies," and would have to purchase Cummins parts "at Retail parts' price levels." (*Id.*)[3]

---

**3.** The Termination Letter reads, in relevant part:

> After careful review by Cummins Power Systems, LLC of its territory and customer support requirements, and National Gear

and Piston's compliance with such requirements, Cummins Power Systems has determined that it is no longer able to maintain National Gear and Piston as an independent dealer. As a result and therefore, Na-

Plaintiff claims that it has "complied in all respects with the terms of its relationship with CPS," and that the allegations in the Termination Letter are false. (Am. Compl. ¶ 53.) In a May 11, 2010 letter, Plaintiff rejected the reasons presented in the Termination Letter. (*Id.* ¶ 54.) Since the Termination Letter, Plaintiff claims that it has "encountered significant difficulties in fulfilling orders under customer contracts existing prior to the termination action," which it believes is punishment for its refusal to obey CPS's bidding prohibition. (*Id.* ¶¶ 56, 60.) For example, CPS allegedly: (1) denied Plaintiff access to Cumpos, the Cummins computer based ordering system, to fulfill outstanding orders; (2) refused to provide Plaintiff the 4% discount to which it was entitled; (3) "unilaterally and without prior notice" imposed a new requirement that every order be accompanied by a full, formal purchase order (where past practice was to notify CPS by telephone or email); and (4) subjected Plaintiff's orders to "significant and substantial delays." (*Id.* ¶¶ 56–57.) These "operational difficulties" allegedly have hampered Plaintiff's ability to respond to bid requests, and have adversely affected Plaintiff's business relationships with its customers. (*Id.* ¶¶ 56–59.) Plaintiff alleges that it "may not be able to complete its orders with its customers, who have outstanding nearly five million dollars in confirmed open orders" due to these operational impediments. (*Id.* ¶ 63.) Plaintiff also alleges that it may lose an essential part of its business base, as evidenced by emails from disgruntled customers, (*id.* Exs. D–F), and alleges that its customers will be forced to incur "unnecessary cost burdens and become the victims of the unfair practices of CPS and Cummins," (Am. Compl. ¶¶ 64, 66).

Cummins is alleged to be "the beneficial owner of eighty-two percent (82%) of the voting shares of [CPS]." (*Id.* ¶ 4.) The Agreement provides that Cummins is a third-party beneficiary "of the provisions of [the] Agreement that refer to Cummins," states that the Agreement may be assigned to Cummins upon written notice to Plaintiff, and includes an appendix entitled "Cummins Inc.: Minimum Insurance Requirements." (*Id.* ¶¶ 12–14; *Id.* Ex. A, §§ 9.3, 10.5.) However, the Agreement also states that "Dealer acknowledges that Distributor is independently incorporated

---

tional Gear and Piston's independent dealer relationship shall terminate effective May 16, 2010. The reasons for such termination with notice include:

1. National Gear and Piston has quoted Cummins' customers non-genuine Cummins' parts when Cummins' warranties are still in effect. In these situations, and as you know, authorized Cummins dealers are required to use genuine Cummins products only. This is a direct violation of dealer policy.

2. National Gear and Piston does not have any qualified technicians trained for current or past midrange Cummins engines. Because of the increased midrange engine population in the immediate area of New York City and surrounding boroughs, it is required that Cummins' dealers supporting these customers are certified in midrange engines and specifically have the qualifications to repair midrange transit engines (along with supplying parts and service).

3. National Gear and Piston has taken, and continues to take, unilateral, unauthorized discounts and deductions from Cummins Power Systems invoices. This is a direct violation of dealer and company policies.

4. National Gear and Piston has not complied with Cummins Power Systems' payment terms (as noted in previous documents, discussions and emails).

As a result of the termination effective May 16, 2010, you will no longer be eligible for any Dealer programs or policies and any purchases of Cummins, ReCon, Filtration, and Onan parts thereafter shall be at Retail parts' price levels.

(Am. Compl. Ex. B.)

with different ownership than Cummins and without the authority to speak for or legally bind Cummins." (*Id.* Ex. A, § 9.2.) Plaintiff alleges that it has apprised Cummins of CPS's actions, and Cummins has failed "to direct that CPS enter into a proper conduct [of] business." (Am. Compl. ¶¶ 61–63.)

### B. Procedural History

This case was commenced on May 14, 2010 in New York Supreme Court, Westchester County. (Notice of Removal (Dkt. No. 1).) On the same day, Plaintiff filed an Order to Show Cause seeking a temporary restraining order and a preliminary injunction against CPS. (*Id.*) The state court signed the Order to Show Cause and issued an ex parte temporary restraining order against CPS until the Parties could appear for argument on May 17, 2010. (*Id.*) The case was removed to this Court by CPS on May 20, 2010. (*Id.*)[4]

This Court continued the temporary restraining order until June 21, 2010. (Dkt. No. 9.) On June 10, 2010, Plaintiff moved for a preliminary injunction. (Dkt. No. 10.) While awaiting the hearing on the preliminary injunction, the Court extended the temporary restraining order through July 19, 2010. (Dkt. No. 17.) On July 19, 2010, the Court held a hearing on the preliminary injunction and on July 20, 2010 denied Plaintiff's request to continue the temporary restraining order. (Dkt. No. 20.) On August 11, 2010, with the consent of the Parties, the Court ordered CPS not to violate the Donnelly Act by conspiring with Plaintiff, and not to "instruct or request Plaintiff to cease bidding on revenue-side mass transit contracts put to bid" by NYCTA. (Order of Aug. 11, 2010 (Dkt.

No. 30).) In doing so, the Court did not make any finding that Defendants had, in fact, violated the Donnelly Act.

Plaintiff brings six causes of action, against both CPS and Cummins. The first cause of action alleges that CPS wrongfully terminated "the 2007 Agreement and [Plaintiff]'s status as a Dealer." (Am. Compl. ¶ 70.) The second cause of action alleges that CPS breached the Agreement by failing to advise Plaintiff that it was entitled to an opportunity to cure the alleged breaches, and failing to give Plaintiff sufficient information to allow it to cure any breaches. (*Id.* ¶ 79.) The third cause of action alleges that CPS breached its duty of good faith and fair dealing underlying the Agreement. (*Id.* ¶ 88.) The fourth cause of action alleges that CPS tortiously interfered with Plaintiff's contract with NYCTA, and with Plaintiff's "open, unfulfilled orders from third parties." (*Id.* ¶¶ 92–102.) The fifth cause of action alleges that CPS tortiously interfered with Plaintiff's prospective business opportunities by "institut[ing] increasingly onerous and unnecessary business constraints." (*Id.* ¶ 108.) The sixth cause of action alleges that CPS violated New York's Donnelly Act, Section 340(1) of the New York General Business Law. (*Id.* ¶ 121.) In all six causes of action, Plaintiff alleges that Cummins "has both the corporate and contractual authority to control the actions of CPS," knew of CPS's wrongful activity, and therefore participated in CPS's wrongful activity "[b]y its activity or failure to act." (*Id.* ¶¶ 72–73, 80–81, 89, 103–104, 114–15, 124–25.)

Plaintiff's Amended Complaint was filed on February 14, 2011. (Dkt. No. 42.)

---

4. This Court has diversity jurisdiction over the action, as Plaintiff is a New York corporation with its primary place of business in New York, CPS is a Delaware corporation with its primary place of business in Pennsylvania, (Notice of Removal ¶¶ 7, 9), and Cummins is an Indiana corporation with its principal place of business in Indiana, (Am. Compl. ¶ 3). Also, Plaintiff seeks $10 million in damages. (Notice of Removal ¶ 8.)

Both Cummins and CPS filed motions to dismiss on April 15, 2011. (Dkt. Nos. 47, 49.) The motions were fully submitted on June 6, 2011. (Dkt. Nos. 53, 54.) The Court heard oral argument on December 7, 2011.

## II. Discussion

### A. Standard of Review

#### 1. Rule 12(b)(6) Motion to Dismiss

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor." *Gonzalez v. Caballero,* 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010) (same).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 424–25 (2d Cir.2008) (holding that district court properly took judicial notice of and considered media reports, state court complaints, and regulatory filings on a motion to dismiss). In the motion to dismiss context, however, the court should generally take judicial notice "to determine what statements [the documents] contain[ ] ... not for the truth of the matters asserted." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (alteration, citations, and internal quotation marks omitted). Instead, the Supreme Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.,* and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, 127 S.Ct. 1955. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955. If a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id.; see also Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " (citation omitted) (quoting Fed. R.Civ.P. 8(a)(2))).

#### 2. Governing State Law

Because federal jurisdiction in this case is based on diversity of citizenship, the conflict-of-law rules of the forum state, New York, determine which state's law governs. *See Cantor Fitzgerald Inc. v. Lutnick,* 313 F.3d 704, 710 (2d Cir.2002). "Here, the parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law." *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 61 (2d Cir.2004) (alterations and internal quotation marks omitted); *see also Texaco A/S v. Commercial*

*Ins. Co. of Newark,* 160 F.3d 124, 128 (2d Cir.1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." (internal quotation marks omitted)).

## B. First and Second Causes of Action: Breach of Contract

■ Plaintiff's first and second causes of action allege that CPS breached its contract with Plaintiff: (1) when it wrongfully terminated "the 2007 Agreement and [Plaintiff]'s status as a Dealer"; (2) when it failed to provide sufficient detail or information about Plaintiff's alleged breaches in the Termination Letter to permit Plaintiff to attempt to cure the breaches; and (3) when it failed to advise Plaintiff that it was entitled to an opportunity to cure the alleged breaches. (Am. Compl. ¶¶ 70, 77–79.) Under New York law, to make out a claim for breach of contract a plaintiff must allege: "the existence of a contract, the plaintiffs' performance under the contract, the defendants' breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.,* 69 A.D.3d 802, 893 N.Y.S.2d 237, 239 (2010); *see also Fischer & Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir.2011) ("[A] breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages.").

### 1. Existence of a Contract

■ The Court must first examine whether a contract existed between the Parties. Plaintiff argues that the Agreement was a binding contract, and, in the alternative, that an implied-in-fact contract existed. "[A]lthough the theories of express contract and of contract implied in fact are mutually exclusive, the federal rules do not require consistency in pleadings, and therefore [Plaintiff] may claim alternatively on an express contract and on an implied contract." *Sharp v. Patterson,* No. 03–CV–8772, 2004 WL 2480426, at *8 (S.D.N.Y. Nov. 3, 2004) (citation and internal quotation marks omitted); *see also Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 376 n. 5 (2d Cir.2000) ("Where the pre-disclosure agreement is not an express contract to pay for the disclosed idea, an idea seller may argue in the alternative that the parties entered into an agreement implied-in-fact." (citation omitted)).

■ The unsigned Agreement states that it is effective "upon the date fully executed." (Am. Compl. Ex. A, § 7.1.) "Under New York law, ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract," but in some circumstances "preliminary agreements can create binding obligations." *Vacold LLC v. Cerami,* 545 F.3d 114, 123–24 (2d Cir.2008) (alteration and internal quotation marks omitted). To determine whether a preliminary agreement such as an unexecuted contract is binding, the Second Circuit has endorsed the test set forth by then-District Judge Leval in *Teachers Insurance & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987). *See Vacold,* 545 F.3d at 125 (employing *Tribune* test); *Brown v. Cara,* 420 F.3d 148, 154 (2d Cir.2005) (same); *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 547–48 (2d Cir.1998) (same); *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989) (same). The test balances two competing policy concerns: the wish to " 'avoid trapping parties in surprise contractual obligations that they never intended,' " with the " 'enforce[ment] and preserv[ation of] agreements that were intended as binding, despite a need for further documentation or further nego-

tiation.'" *Brown*, 420 F.3d at 156–57 (alterations in original) (quoting *Tribune*, 670 F.Supp. at 497–98).

*Tribune* sets out two types of binding preliminary agreements. Type I agreements are fully binding, and are preliminary "only in the sense that the parties desire a more elaborate formalization of the agreement." *Adjustrite*, 145 F.3d at 548 (internal quotation marks omitted). Type II agreements are created when parties "agree on certain major terms, but leave other terms open for further negotiation," and are binding only to the extent that the parties are committed to "negotiate together in good faith" to reach their ultimate contractual objective. *Id.* (internal quotation marks omitted). A Type II agreement "does not commit the parties to their ultimate contractual objective." *Tribune*, 670 F.Supp. at 498. Plaintiff argues that the Agreement is itself a contract the terms of which are binding, and does not argue that Defendants breached the contract by failing to negotiate in good faith, so the Court does not need to examine whether the Agreement is a Type II agreement.

▪ To determine whether parties have reached a Type I preliminary agreement, courts consider: "(1) whether there has been an express reservation of the right not to be bound in the absence of writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F.Supp.2d 403, 411 (S.D.N.Y.2011) (citing *Adjustrite*, 145 F.3d at 549). The analysis must not put "disproportionate emphasis ... on any single act, phrase or other expression, but, instead, [should consider] the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Brown Bros. Elec. Contractors v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977); *see also Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F.Supp.2d 428, 441 (S.D.N.Y.2003) (same).

▪ The first factor is "frequently the most important," and "is frequently determined by explicit language of commitment or reservation." *Brown*, 420 F.3d at 154. *But see R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir.1984) ("No single factor is decisive, but each provides significant guidance."). "Indeed, if the language of the agreement is clear that the parties did not intend to be bound, the Court need look no further." *Cohen v. Lehman Bros. Bank, FSB*, 273 F.Supp.2d 524, 528 (S.D.N.Y.2003); *see also Arcadian*, 884 F.2d at 72–73 (affirming grant of summary judgment in breach of contract action even though there was "considerable partial performance," where language of memorandum showed that parties did not intend to be bound until final contract was signed); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261–62 (2d Cir.1984) (holding that Defendant was not bound by a draft agreement, where the drafts and testimony demonstrated that the agreement would be binding "when executed and delivered"); *Bear Stearns Inv. Prods., Inc. v. Hitachi Auto. Prods. (USA), Inc.*, 401 B.R. 598, 617 (Bankr.S.D.N.Y.2009) ("[I]f either party communicates an intention not to be bound absent a fully executed document, 'then no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.'"(quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985))); *Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, No. 05–CV–10528, 2008 WL 4579758, at *10 (S.D.N.Y. Oct. 14, 2008)

(granting summary judgment to defendant, where the "undisputed facts—in particular, the correspondence between the parties and the language in the contract—clearly show that the Agreement was not binding until executed"); *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, 427 F.Supp.2d 463, 481 (S.D.N.Y.2006) (concluding that binding agreement was not reached on amendment of programming schedule, where earlier agreement required that amendments take the form of "a written instrument duly executed by all parties," and written amendment was not signed), *aff'd*, 264 Fed.Appx. 36 (2d Cir. 2008). Courts should give statements that the parties did not intend to bind themselves until an agreement had been signed "considerable weight," to "avoid frustrating the clearly-expressed intentions of the parties." *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 324 (2d Cir.1997).

Here, the Agreement explicitly states that it is effective "upon the date fully executed." (Am. Compl. Ex. A, § 7.1.) The Agreement ends with "IN WITNESS WHEREOF, the parties have executed this Agreement ... by their undersigned, duly authorized agents," with a space for the signature of both the "Dealer" and CMP, "Distributor." (Am Compl. Ex. A.) No party argues that the Agreement has been fully executed, as it remains unsigned. Further, the Agreement contains a merger clause, which states that the Agreement "constitutes the entire agreement between Dealer and Distributor, superseding all prior" agreements and understandings, and "may be amended only by a writing signed by both parties hereto." (*Id.* § 10.1.) "The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella*, 131 F.3d at 324 (citing similar merger clause); *see also R.G. Group*, 751 F.2d at 76 (clause stating "that any modification in the agreement would

... have to be in writing and signed" indicated the parties did not intend to be bound prior to execution of the contract). These provisions all demonstrate a clear intent to be bound only once the Agreement was signed by both Parties. *See Kargo*, 2008 WL 4579758, at *7–8 (first factor "strongly favors" defendant where unsigned agreement (1) ended with "in witness whereof," followed by signature lines for both parties, (2) referenced representatives signing on both parties' behalf, and (3) required any amendments to be in writing and signed); *see also Ciaramella*, 131 F.3d at 324–25 (finding "numerous indications" in proposed agreement "that the parties did not intend to bind themselves until the [agreement] had been signed," such as statement that agreement would not become effective until signed by both parties, and merger clause); *R.G. Group*, 751 F.2d at 76 (holding that first factor "unequivocally supports" defendant, where agreement "declared on its face that 'when duly executed' it would set forth the parties' rights and obligations, that there were no other agreements between the parties, and that any modification in the agreement would also have to be in writing and signed").

As to the second factor, Plaintiff alleges that there has been partial performance, noting that it "performed generally pursuant to the terms set forth in the un-executed contract." (Am. Compl. ¶ 17.) However, since Plaintiff had been performing as a Cummins dealer "for many months prior to the alleged agreement ... the fact that [Plaintiff] continued performing after that point does not strongly indicate the existence of an agreement." *Kargo*, 2008 WL 4579758, at *9. "Moreover, the second factor of partial performance is not dispositive, and in some cases it is given little weight." *Id.; see also Adjustrite*, 145 F.3d at 551 (affirming summary judgment for defendants where, despite partial per-

formance, "three of the four factors strongly point to the conclusion that the parties here did not intend to be bound until the formal documents were negotiated, executed, and delivered"); *United States v. U.S. Currency in the Sum of $660,200*, 423 F.Supp.2d 14, 28 (E.D.N.Y. 2006) (noting that "it is the second factor that appears to have had the least sway with courts").

As to the third factor, there is no indication that there were any terms yet to be agreed upon. The Agreement was the standard contract used for Cummins distributors, (*id.* ¶ 11), and does not reference any further negotiations or steps to be taken (indeed, neither Party alleges that any additional negotiating was done). The fact that there are no further issues to negotiate "appears to be a prerequisite for enforcing an *unexecuted* contract," but "does not foreclose a holding that a proposed agreement is unenforceable because the parties did not intend to be bound until it was in writing and signed." *Kargo*, 2008 WL 4579758, at *9 (emphasis in original).

The fourth factor, whether the agreement at issue is the type of contract that is usually committed to writing, cuts both for and against Plaintiff. On the one hand, Plaintiff alleges that the Agreement is the standard contract used by Cummins for all its dealers. (Am. Compl. ¶ 11.) On the other hand, Plaintiff by its own admission functioned as a dealer for eight years prior without any sort of written agreement. (*Id.* ¶¶ 7, 10.)

While courts are "often reluctant to rule on the issue of intent to form a binding agreement in a judgment on the pleadings, and must be cautious in making such determinations," *Spencer Trask*, 383 F.Supp.2d at 439, here the language of the Agreement makes clear that Defendants did not intend to be bound until the Agreement was executed, and Plaintiff has not offered plausible allegations to the contrary.[5] The Court therefore finds that Plaintiff has failed to adequately allege the existence of a Type I preliminary agreement. *See Spencer Trask*, 383 F.Supp.2d at 445 (granting motion to dismiss where the only factor in plaintiff's favor was partial performance, holding that "that factor alone is insufficient to state a claim for relief"); *IDT Corp. v. Tyco Grp.*, 13 N.Y.3d 209, 890 N.Y.S.2d 401, 918 N.E.2d 913, 916–17 (2009) (affirming dismissal

**5.** In its opposition papers, Plaintiff attaches the affidavit of Karl Gontkof, Vice President of CPS's Engine Business, which states that "[p]rior to April 2008, CMP had a distributor-dealership type of relationship with Plaintiff. After it ... purchased ... CMP, CPS continued the relationship with Plaintiff pursuant to the terms of an unsigned Cummins Engine Dealership Agreement." (Pl.'s Opp'n to CPS's Mot. to Dismiss Ex. 1, ¶ 5.) This type of evidence can be used to show a party's intent to be bound by a Type I preliminary agreement. *See Bitumenes Orinoco, S.A. v. New Brunswick Power Holding Corp.*, No. 05–CV–9485, 2007 WL 485617, at *13–15 (S.D.N.Y. Feb. 13, 2007) (noting that unsigned agreement contained "blank signature lines, a blank effective date linked to signature, a merger clause, a no oral modification clause, a counterparts clause, and a waiver of sovereign immunity clause upon 'execution'

clause," but nevertheless denying summary judgment where plaintiff offered admissions from people directly involved in negotiating the agreement, including defendant's executives, that the parties did not intend to condition the agreement on formal execution). The Court cannot consider this statement in deciding this motion, as it was not included or incorporated by reference in the Complaint, and "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F.*, 199 F.3d at 107 (internal quotation marks omitted). Needless to say, were Plaintiff to allege this in a Second Amended Complaint, it might change the Court's analysis.

where agreement "contemplated the occurrence of numerous conditions, i.e., the negotiation and execution of four additional agreements" before it became binding); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce,* 70 A.D.3d 423, 894 N.Y.S.2d 47, 50 (2010) (dismissing breach of contract claim for lack of binding agreement, where agreement made "a number of references to future definitive documentation," and "clearly expressed an intent not to be bound until those documents were actually executed"); *Jordan Panel Sys., Corp. v. Turner Constr. Co.,* 45 A.D.3d 165, 841 N.Y.S.2d 561, 572–73 (2007) (affirming dismissal of breach of contract claim, where undisputed evidence established that defendant advised plaintiff in writing that he would not be contractually bound until both parties had signed the contemplated written agreement, and citing "numerous cases ... uphold[ing] a party's right to attach the condition of a signed writing to its becoming contractually bound"); *cf. Einhorn v. Mergatroyd Prods.,* 426 F.Supp.2d 189, 194 (S.D.N.Y. 2006) (denying motion to dismiss where there was partial performance and "there was no express reservation of the right not to be bound in the absence of a writing").

■ Apart from the Agreement, Plaintiff also alleges that an implied-in-fact contract governed its relationship with CPS, and before it CMP, the terms of which were memorialized by the Agreement. "[A]n implied-in-fact contract arises 'when the agreement and promise have simply not been expressed in words,' but 'a court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it.'" *Nadel,* 208 F.3d at 376 n. 5 (quoting *Maas v. Cornell Univ.,* 94 N.Y.2d 87, 699 N.Y.S.2d 716, 721 N.E.2d 966, 969–70 (1999)). "An implied-in-fact contract 'requires such elements as consideration, mutual assent, legal capacity and legal subject matter.'" *Id.* (quoting *Maas,* 699 N.Y.S.2d 716, 721 N.E.2d at

970); *see also Lapine v. Seinfeld,* 31 Misc.3d 736, 918 N.Y.S.2d 313, 318 (Sup. Ct.2011) (same). "In determining whether the parties' conduct is consistent with the existence of a binding contract, it is necessary that the totality of all acts of the parties, their relationship and their objectives be considered." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 97 (2d Cir.2007) (internal quotation marks omitted). "Under settled law, a contract will not be found to have been formed if it is 'not reasonably certain in its material terms.'" *Lapine,* 918 N.Y.S.2d at 318 (quoting *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203, 206 (1989)).

■ Plaintiff alleges that the "pattern and practice of [the] business relationship" between Plaintiff and Defendants "amount[ed] to a valid, enforceable contract between the parties," (Pl.'s Opp'n to CPS's Mot. to Dismiss ("Opp'n to CPS") 8), and that "[i]n material effect, the 2007 Agreement proffered to [Plaintiff] by CMP memorialized the terms and practices of the business relationship as it had existed between the parties since 1999," (Am. Compl. ¶ 17). While an implied-in-fact contract may arguably have governed the Parties' business relationship between 1999 and 2007, it appears that CMP intended to be bound by the specific terms of the Agreement only *upon execution,* as discussed above. "A contract may not be implied in fact from the conduct of the parties where it appears that they intended to be bound only by a formal written agreement." *Valentino v. Davis,* 270 A.D.2d 635, 703 N.Y.S.2d 609, 612 (2000) (internal quotation marks omitted). Because the Court concludes above that the Parties intended to be bound only by a formal, executed written agreement, it finds that Plaintiff has not adequately alleged the existence of an implied-in-fact contract. *See Kargo,* 2008 WL 4579758, at

*12 ("Because I conclude that the parties intended to be bound only by a formal written agreement, this cause of action for breach of an implied-in-fact contract is dismissed.").

### 2. Plaintiff's Performance Under the Contract

Plaintiff alleges that it performed "generally pursuant" to the terms set forth in the Agreement, (Am. Compl. ¶ 17), and that it "complied in all respects with the terms of its relationship with CPS," (*id.* ¶ 53). While the statement that Plaintiff performed "generally pursuant" to the Agreement, standing alone, might be construed to mean that Plaintiff did not fully perform, Plaintiff's later statement that it "complied in all respects" with the Agreement clarifies that Plaintiff alleges that it fully performed under the Agreement. Plaintiff states that pursuant to the Agreement, it "functioned as an authorized dealer representative" of Defendants, and "developed customer relationships; offered for sale components and materials required by customers; set pricing and payment terms for such sales; acquired from [Defendants] inventory to fulfill orders actually placed, and provided after-sale service and information to customers." (*Id.* ¶ 18.) This is sufficient to allege due performance. *See Oberstein v. SunPower Corp.,* No. 07–CV–1155, 2010 WL 1705868, at *6 (E.D.N.Y. Apr. 28, 2010) (holding that plaintiff alleged adequate performance by claiming that it originated and developed markets for defendant's products, and executed contracts using exclusively defendant's products, in accordance with its installer-partner agreement with defendant); *In re InSITE Servs. Corp.,* 287 B.R. 79, 92 (Bankr.S.D.N.Y.2002) ("Courts rarely dismiss on the ground that the plaintiff has not included the talismanic words, 'due performance,' in its complaint."); *see also Fraley v. BAC Home Loans Servicing, LP,* No. 11–CV–1060, 2012 WL 779130, at *4 (N.D.Tex. Jan. 10, 2012) (denying motion to dismiss breach of contract claim, under similar Texas standard, where plaintiff had alleged that "he tendered, or attempted to tender, performance under the contract by making his regular payments"). *But cf. Jasper & Black, LLC v. Carolina Pad Co.,* No. 10–CV–3562, 2012 WL 413869, at *9 (S.D.N.Y. Feb. 9, 2012) (dismissing breach of contract claim where contract imposed thirteen duties on plaintiff, but plaintiff only alleged performance of certain duties, noting that "to adequately plead due performance, Plaintiff must allege that it duly performed all thirteen duties").[6]

---

**6.** Cases dismissing breach of contract claims for failure to allege due performance have involved complaints that "failed to make even a general allegation that [plaintiff] had performed its obligations under the contract." *Conergy AG v. MEMC Elec. Materials, Inc.,* 651 F.Supp.2d 51, 62 n. 97 (S.D.N.Y.2009); *see also Rojas v. Don King Prods., Inc.,* No. 11–CV–8468, 2012 WL 760336, at *3 (S.D.N.Y. Mar. 6, 2012) (dismissing breach of contract claim because "the complaint fail[ed] to allege compliance with the [contract] in even general terms"); *Global Crossing Bandwidth, Inc. v. PNG Telecomms., Inc.,* No. 06–CV–6415, 2007 WL 174094, at *2 (W.D.N.Y. Jan. 22, 2007) ("In the instant case, plaintiff has alleged that the parties entered into a contract, that [defendant] breach-ed the contract, and that [plaintiff] has been damaged as a result of the breach. [Plaintiff] has failed, however, to allege that it adequately performed under the contract." (citations omitted)); *Udell v. Berkshire Life Ins. Co. of Am.,* No. 03–CV–2721, 2005 WL 1243497, at *5 (E.D.N.Y. May 25, 2005) ("[P]laintiff does not even generally allege performance of his ... remaining obligations under the [contract].")); *Sony Fin. Servs., LLC v. Multi Video Grp., Ltd.,* No. 03–CV–1730, 2003 WL 21396690, at *2 (S.D.N.Y. June 17, 2003) ("[The second counterclaim] fails to allege ... that the defendants actually performed their obligations under the contract." (internal quotation marks omitted)); *Global Intellicom, Inc. v. Thomson Kernaghan & Co.,* No. 99–

### 3. Breach

However, even if Plaintiff has alleged that it had a contract with Defendants (whether in writing or implied-in-fact) and that it performed under that contract, Plaintiff has failed to allege that Defendants breached any such contract. Plaintiff alleges that CPS breached the Agreement: (1) when it wrongfully terminated its working relationship with Plaintiff; (2) when it failed to provide sufficient detail or information about Plaintiff's alleged breaches in the Termination Letter, so as to permit Plaintiff to attempt to effect a cure of any breaches; and (3) when it failed to advise Plaintiff that it was entitled to an opportunity to cure the alleged violations. (Am. Compl. ¶¶ 70–71, 77–79.)

#### a. Termination Requirements

██ Plaintiff alleges that CPS breached the Agreement when it wrongfully terminated it. (*Id.* ¶¶ 70–71.) Section 7.2 of the Agreement permits CPS to terminate the Agreement "at any time, for any or no reason, upon 60 days' prior written notice to the other party." (*Id.* Ex. A § 7.2.) Section 7.4 permits CPS to terminate the Agreement "at any time, without further notice, if [Plaintiff] is in breach of this Agreement, or other good cause for termination exists," and Plaintiff "fails to cure the breach or cause within 30 days" of written notice. (*Id.* § 7.4.)

CPS moves to dismiss Plaintiff's claim, arguing that it complied with the termination requirements contained in Section 7.2. (Mem. of Law in Supp. of CPS's Mot. to Dismiss ("CPS's Mem.") 8–9.) CPS argues, in the alternative, that it complied with Section 7.4 of the Agreement, and that Plaintiff has not alleged "that CPS terminated the relationship prior to the expiration of the 30–day period." (*Id.*) The Termination Letter does not reference the Agreement, nor does it refer to either of the termination provisions. It is dated April 14, 2010, and states that Plaintiff's "independent dealer relationship shall terminate effective May 16, 2010," (Am. Compl. Ex. B), thus providing 32 days notice of termination.

While the date of the Termination Letter is undisputed, Plaintiff has not specified in its Complaint when exactly CPS actually ended the relationship. Plaintiff merely states that "since the date of the CPS termination letter" it has "encountered significant difficulties in fulfilling orders under customer contracts existing prior to the termination action." (Am. Compl. ¶ 56.) Plaintiff also cites "operational difficulties encountered . . . since the date of the termination action," without specifying when the termination action took place. (*Id.* ¶ 59.)[7] However, the earliest date given for any alleged action consistent with termination is September 2010, when Plaintiff was denied access to Cumpos, the Cummins database. (*Id.* ¶ 56.)

██ The date that CPS terminated the relationship is important, because even if it did not have good cause to terminate pursuant to Section 7.4, if it terminated the Agreement 60 days after Plaintiff received

CV–342, 1999 WL 544708, at *18 (S.D.N.Y. July 27, 1999) (dismissing breach of contract claim because plaintiff failed to allege its own performance, and failed to allege that it was excused from performing because of defendants' breach); *R.H. Damon & Co. v. Softkey Software Prods., Inc.,* 811 F.Supp. 986, 991 (S.D.N.Y.1993) ("[W]hen pleading a claim for the breach of an express contract, as in the instant case, the complaint must contain some allegation that the plaintiffs actually performed their obligations under the contract.").

7. CPS states in its motion papers that Plaintiff was on notice of the termination "well past the 60 days," but does not specify when it terminated the relationship. (CPS's Mem. 8 n. 4.)

the Termination Letter, it complied with Section 7.2. *See Schwartz v. Fortune Magazine,* 89 F.Supp.2d 429, 434 (S.D.N.Y.1999) (holding that plaintiff's allegations that defendant terminated the contract "because of malevolence, anger and other bad faith motivations" were irrelevant, as "the court does not inquire into why a party exercised his right to terminate a contract when the contract is terminable without cause"). This is true even though the Termination Letter states that the Agreement will terminate on May 16, 2010, 28 days less than the 60 days provided for in Section 7.2. (Am. Compl. Ex. B.) Under New York's "erroneous date" rule, "a termination notice which erroneously identifies the termination date is nonetheless sufficient to effect a termination as of the first proper termination date." *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.,* 706 F.Supp.2d 350, 356 (S.D.N.Y.2009) (citing *G.B. Kent & Sons, Ltd. v. Helena Rubinstein, Inc.,* 47 N.Y.2d 561, 419 N.Y.S.2d 465, 393 N.E.2d 460, 461 (1979)); *see also Robert J. McRell Assocs. v. Ins. Co. of N. Am.,* 677 F.Supp. 721, 726 (S.D.N.Y.1987) (same); *Colman & Hirschmann, Inc. v. Little Tikes, Inc.,* No. 84–CV–1296, 1986 WL 4688, at *5 (S.D.N.Y. Apr. 17, 1986) (same); *Ellman v. Chatwal,* 209 A.D.2d 287, 631 N.Y.S.2d 1, 1 (1994) (applying erroneous date rule). Here, the "first proper termination date" pursuant to Section 7.2 is 60 days after April 14, 2010, or June 13, 2010. Therefore, to allege wrongful termination, Plaintiff must at the very least allege that CPS terminated its relationship with Plaintiff prior to June 13, 2010, which it has not done.

### b. Failing to Provide Sufficient Detail

Plaintiff also alleges that Defendant breached the Agreement by failing in its Termination Letter to "provide [Plaintiff] with sufficient detail or information to attempt to effect a cure." (Am. Compl.

¶ 79.) However, the Second Circuit has declined "to construe the notice provision as if it were a common law pleading requirement under which every slip would be fatal." *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 925 (2d Cir.1977); *see also RBFC One, LLC v. Zeeks, Inc.,* 367 F.Supp.2d 604, 617 (S.D.N.Y.2005) ("Notice provisions in a commercial contract should not be construed pedantically." (citing *Contemporary Mission,* 557 F.2d at 925)), *aff'd,* 171 Fed. Appx. 902 (2d Cir.2006). "Rather, the law requires that the court look to see if defendant's actions in terminating a contract served the general purpose of the contract's pretermination notice provision." *Schwartz,* 89 F.Supp.2d at 433 (citing *Contemporary Mission,* 557 F.2d at 925).

The Termination Letter set out four clear and specific "reasons for ... termination with notice": (1) Plaintiff's practice of quoting "Cummins' customers non-genuine Cummins' parts when Cummins' warranties are still in effect ... [in] direct violation of dealer policy"; (2) Plaintiff's failure to employ "qualified technicians trained for current or past midrange Cummins engines," in contravention of dealer policy; (3) Plaintiff's "unilateral, unauthorized discounts and deductions from [CPS] invoices ... [in] direct violation of dealer and company policies"; and (4) Plaintiff's noncompliance with CPS's payment terms. (Am. Compl. Ex. B.) Courts have routinely found termination notices with such detail to be sufficient. *See, e.g., Carvel Corp. v. Diversified Mgmt. Grp., Inc.,* 930 F.2d 228, 233 (2d Cir.1991) (holding that plaintiff's letter stating that defendant had failed to make payments on promissory notes gave defendant "explicit notice" of its breach as well as opportunity to cure, and plaintiff would therefore "have been within its rights to terminate the agreement" after the opportunity to cure elapsed); *Contemporary Mission,* 557

F.2d at 925 (holding that telegram, even though it referenced the wrong contractual provision in its description of the breach, nevertheless gave plaintiff "adequate notice that [defendant] considered the contract to have been materially breached"); *cf. L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 434 (2d Cir.2011) (holding that plaintiff had stated a claim for wrongful termination, where defendant's termination letter "provided only notice of termination—effective immediately—without providing [plaintiff] with notice of its alleged breaches and 30 days' opportunity to cure," as required by contract); *USI Ins. Servs. LLC v. Miner,* 801 F.Supp.2d 175, 184 (S.D.N.Y.2011) (holding that defendant had not given adequate notice where the record was "devoid of any statements" indicating that defendant believed there was a breach, or that defendant was triggering the agreement provisions that would allow plaintiff an opportunity to cure any alleged defects); *Needham v. Candie's, Inc.,* No. 01–CV–7184, 2002 WL 1896892, at *3 (S.D.N.Y. Aug. 16, 2002) (holding that plaintiff did not provide notice before terminating employment and therefore was not entitled to six months' compensation pursuant to employment contract, where he merely stated that he had decided to end his employment "for Good Reason," but did not explain good reason), *aff'd,* 65 Fed.Appx. 339 (2d Cir.2003); *Mike Bldg. & Contracting, Inc. v. Just Homes, LLC,* 27 Misc.3d 833, 901 N.Y.S.2d 458, 469–70 (Sup.Ct.2010) (holding that defendant wrongfully terminated the contract, where the contract required written notice and seven days to cure, and termination letter merely stated that contract would be terminated in seven days, without any notice of reason for termination).

Additionally, Plaintiff acknowledged in its May 11, 2010 reply letter that the Termination Letter "purport[ed] to set out legitimate operational and administrative reasons underlying this decision." (Am.

Compl. Ex. C.) Plaintiff then stated that it "reject[ed] each and every reason for termination presented in [the] letter, and [stood] ready to demonstrate the misstatement of fact contained in each." (*Id.*) Given these statements, it is implausible for Plaintiff to now deny that it "had sufficient detail or information regarding to alleged breaches" to "attempt to effect a cure." (Am. Compl. ¶ 78.)

### c. Failing to Advise of Opportunity to Cure

■ Plaintiff further claims that CPS breached the contract by failing to provide Plaintiff "with explicit notice of an opportunity to cure the alleged breaches." (*Id.* ¶ 79.) Specifically, Plaintiff claims that the Agreement required CPS to advise Plaintiff that it was entitled to an opportunity to cure any alleged breaches prior to termination. CPS did not once use the word "cure" in its Termination Letter, but merely stated that the relationship would terminate "with notice" effective May 16, 2010, for the four reasons discussed above. (Am. Compl. Ex. B.)

The law does not require any more notice than that provided by CPS. *See Carvel,* 930 F.2d at 233 (holding that plaintiff "effectively complied with the notice and cure provisions under the agreement," where plaintiff informed defendant in a letter that defendant had not made payments as required by contract, and that in one month plaintiff would begin debiting the missing payments from its compensation payments to defendant, because letter gave defendant "explicit notice of its failure to make payments," and "more than thirty days ... to cure the default"); *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* No. 00–CV–8720, 2004 WL 2072501, at *5 (S.D.N.Y. Sept. 14, 2004) (holding that notice was sufficient even though letter "did not seek a cure," because the contract did not state that "in

order for notice of a breach to be effective it must affirmatively seek a cure," and the letter was "more than adequate to apprise defendants in more or less formal shape of the breaches complained of" (internal quotation marks omitted)), *aff'd in relevant part, vacated and remanded in part on other grounds*, 424 F.3d 195 (2d Cir.2005); *Gorey v. Allion Healthcare Inc.*, No. 04–CV–18346, 18 Misc.3d 1118(A), 2008 WL 183721, at *6 (N.Y.Sup.Ct. Jan. 7, 2008) (holding that notice with an opportunity to cure was given, where plaintiff did not call his letter "a notice to cure," but stated in the letter that he was "giving the Defendant notice of his resignation for 'Good Reason'," detailed defendant's alleged non-compliance with the agreement, and gave defendant 30 days before transferring his responsibilities). Because the 2007 Agreement does not require CPS to affirmatively seek a cure, but merely requires "written notification" to Plaintiff and thirty days to attempt to cure the breach, (Am. Compl. Ex. A, § 7.4), the Termination Letter provided sufficient notice.

Therefore, the Court grants Defendants' motion to dismiss the first and second causes of action.

### C. Third Cause of Action: Breach of Duty of Good Faith and Fair Dealing

In its third cause of action, Plaintiff alleges that CPS breached its duty of good faith and fair dealing underlying the Agreement by: (1) asking Plaintiff to "engage in conduct which [CPS] knew to be both anti-competitive and illegal" (presumably referring to the alleged bidding prohibition); (2) changing Plaintiff's credit status from preferred credit to COD only to punish Plaintiff for its continued bidding; (3) attempting to terminate the Agreement for "invalid, groundless reasons"; (4) failing to provide Plaintiff with notice that it was entitled to an opportunity to cure the alleged breaches; and (5) causing Plaintiff

to lose a NYCTA contract (presumably bid number 76037). (Am. Compl. ¶ 88.)

"Under New York law, implicit in all contracts is a covenant of good faith and fair dealing in the course of the contract performance." *DBT Gmbh v. J.L. Mining Co.*, 544 F.Supp.2d 364, 384 (S.D.N.Y.2008) (internal quotation marks omitted). The Second Circuit has explained that under this doctrine

neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. However, this covenant only applies where an implied promise is so interwoven into the contract as to be necessary for effectuation of the purposes of the contract. For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties. However, the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.

*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir.2006) (citations and internal quotation marks omitted); *see also Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir.2011) (" 'This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' "(quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 746 N.Y.S.2d 131, 773 N.E.2d 496, 500 (2002))). "The implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d

187, 198–99 (2d Cir.2005) (citation, alteration, and internal quotation marks omitted). Thus, Plaintiff bears "a heavy burden" in bringing a duty of good faith and fair dealing claim, because it must prove "not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement viewed as a whole." *DBT*, 544 F.Supp.2d at 384 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566, 570 (1978)).

■ Plaintiff's claim that Defendants breached their duty of good faith by failing to provide Plaintiff with notice to cure is identical to its breach of contract claim, discussed above, and is dismissed as redundant. "Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract," and a claim for breach of the implied covenant "will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir.2002) (citations and internal quotation marks

omitted); *see also Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 508 (2d Cir.2005) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." (internal quotation marks omitted)); *Toledo Fund, LLC v. HSBC Bank*, No. 11–CV–7686, 2012 WL 364045, at *5 (S.D.N.Y. Feb. 3, 2012) (dismissing Plaintiff's "separate claim for breach of the implied covenant of good faith and fair dealing [because it was] entirely redundant of the breach of contract claim").

■ Equally non-viable is Plaintiff's claim that CPS's decision to change Plaintiff's credit status to COD violated the duty of good faith and fair dealing. The Agreement's Terms and Conditions of Sale provide that CPS "reserves the right to suspend all credit terms and to require full or partial payment in advance before shipment." (Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Prelim. Inj. Mem.") Ex. A (Dkt. No. 10).) [8] The Agreement also states that these terms and conditions "constitute the entire agreement," and "[n]o additional or different terms or conditions … will be of any force or effect."

---

8. While Plaintiff did not attach the Terms and Conditions of Sale to its Amended Complaint, it was attached to Plaintiff's motion for a preliminary injunction. (Prelim. Inj. Mem. Ex. A.) "Where a plaintiff has relied on the terms and effect of a document in drafting the complaint, and that document is thus integral to the complaint, [the Court] may consider its contents even if it is not formally incorporated by reference." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir.2005) (alteration and internal quotation marks omitted). "Indeed, where the claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim." *Bader v. Wells Fargo Home Mortg. Inc.*, 773

F.Supp.2d 397, 407 (S.D.N.Y.2011) (internal quotation marks omitted); *see also Berman v. Sugo LLC*, 580 F.Supp.2d 191, 201 (S.D.N.Y. 2008) ("The unsigned Operating Agreement … is also within the scope of the Court's review on this motion to dismiss because it is incorporated into the Counterclaims by reference or through [defendants'] reliance in making their allegations."); *Assoko v. City of New York*, 539 F.Supp.2d 728, 732 n. 1 (S.D.N.Y.2008) (considering purchase agreements in motion to dismiss, even though they were not attached to the complaint, because plaintiffs relied on the agreements in several causes of action). Thus, the Court may consider this document in deciding the instant motions.

(*Id.*) Therefore, Plaintiff is precluded from claiming that insistence on COD violated Defendants' duty of good faith and fair dealing. *See Talansky v. Am. Jewish Historical Soc.*, 8 A.D.3d 150, 779 N.Y.S.2d 58, 59 (2004) (dismissing breach of duty of good faith and fair dealing claim because claim was "inconsistent" with contract); *see also In re Musicland Holding Corp.*, 386 B.R. 428, 438–39 (Bankr.S.D.N.Y.2008) ("The duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms. Thus, courts have generally been reluctant to find a breach of the implied covenant of good faith when doing so reads so much into the contract as to create a new term or when alleged misconduct is expressly allowed by the contract." (citations and internal quotation marks omitted)).

■■■ Defendants' bid prohibition and acts related to NYCTA bid number 76037 could form the basis of a claim for breach of the duty of good faith and fair dealing, but, for the reasons discussed above, Plaintiff has not adequately alleged the existence of a contract. "[T]here can be no covenant of good faith and fair dealing implied where there is no contract." *Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*, 276 A.D.2d 673, 714 N.Y.S.2d 338, 342 (2000). "Consequently, a 'cause of action for breach of an implied duty of good faith and fair dealing ... [is] properly dismissed for lack of a valid and binding contract from which such a duty would arise.'" *Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, No. 05–CV–8746, 2006 WL 330323, at *7 (S.D.N.Y. Feb. 14, 2006) (alterations in original) (quoting *Am.-Eur. Art Assocs., Inc. v. Trend Galleries, Inc.*, 227 A.D.2d 170, 641 N.Y.S.2d 835, 836 (1996)).

### D. Fourth Cause of Action: Tortious Interference with Contract

The fourth cause of action alleges that CPS tortiously interfered with Plaintiff's contract with NYCTA when CPS told NYCTA that Plaintiff's bid number 76037 was inappropriate, leading NYCTA to cancel Plaintiff's bid. (Am. Compl. ¶¶ 92–97.) Plaintiff also alleges that CPS tortiously interfered with Plaintiff's "open, unfulfilled orders from third parties," of which CPS was allegedly aware, by terminating the Agreement and imposing "operational impediments," and "fail[ing] or refus[ing] to process orders." (*Id.* ¶¶ 98–102.)

■■■ "Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir.2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1375 (1996)); *see also Medtech Prods. Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 796 (S.D.N.Y.2008) (same).

#### 1. NYCTA Bid Number 76037

Plaintiff alleges that CPS interfered with Plaintiff's contract with NYCTA when CPS communicated to NYCTA that Plaintiff's bid number 76037 "was inappropriate because there was no list price for reconditioned [Cummins] engine parts." (Am. Compl. ¶ 94.)

■■■ First, the Court must examine whether an accepted bid is considered a valid contract.[9] Courts in New York have

---

**9.** Courts in different jurisdictions have come out both ways on whether a binding contract is formed when a bid is accepted, but before the formal contract documents are fully executed. *Compare Ry–Tan Constr., Inc. v.*

held that if a bid is irrevocable, timely acceptance creates a binding contract. *See Carolina Cas. Ins. Co. v. ADC Contracting & Constr., Inc.,* 300 A.D.2d 259, 754 N.Y.S.2d 235, 235 (2002) ("There was a valid and binding contract between [defendant] and the plaintiff, since the bid submitted by [defendant] was irrevocable and was timely accepted by plaintiff."); *Consol. Edison Co. v. Gen. Elec. Co.,* 161 A.D.2d 428, 555 N.Y.S.2d 355, 355 (1990) (holding that accepted bid was a contract, where bid was irrevocable). Whether acceptance of a non-irrevocable bid creates a contract is less clear, and may depend on the instructions given to bidders and the terms of the bid. *See Town of Hempstead v. U.S. Trucking Corp.,* 31 Misc.2d 419, 219 N.Y.S.2d 637, 638–39 (Sup.Ct.1961) (noting that in the context of contracts with municipal corporations, a contract "may arise from the submission of a proposal and its acceptance by a resolution adopted by the governing body of the corporation," unless the bid itself or bidding instructions "specif[y] that liability is dependent on execution of a contract" (collecting cases)). Without more information from Plaintiff on its bid, and the NYCTA bidding process, the Court cannot make this determination.[10] Plaintiff also has not sufficiently alleged that NYCTA breached any alleged contract with Plaintiff merely by cancelling the bid, where Plaintiff does not give any information on the nature of the bid acceptance. *See Kirch,* 449 F.3d at 402 (holding that plaintiffs failed to allege actual breach where plaintiff nowhere asserted that third party actually breached a contract, and refusing to infer from plaintiff's claims that third party "abandoned" and "walked away" from a deal that third party "violated the terms of a contract with [plaintiff] when it did so").

Plaintiff, if it wishes to prosecute this cause of action, must therefore amend the Complaint to properly allege that the accepted bid was a contract, and that the contract was breached when NYCTA cancelled the bid. In the meantime, this cause of action is dismissed without prejudice.

*2. Unspecified Third Party Contracts*

[27] Plaintiff's other claim, that CPS interfered with unspecified "outstanding contracts that [Plaintiff] has with third parties," of which CPS was allegedly aware, (Am. Compl. ¶ 99), fails. First, Plaintiff has not adequately alleged the existence of a specific contract between itself and a particular third party, simply by stating that it has "open, unfulfilled orders" and "outstanding contracts" with unspecified third parties, (*id.* ¶¶ 98–99). *See Bose v. Interclick, Inc.,* No. 10–CV–9183, 2011 WL 4343517, at *10–11 (S.D.N.Y. Aug. 17, 2011) (dismissing tortious interference with contract claim where plaintiff claimed generally that it had contracts with various parties, but did not give "facts regarding the terms of the contracts or the specific parties to the contracts"); *Ho Myung Moolsan Co. v.*

*Washington Elementary Sch. Dist. No. 6,* 210 Ariz. 419, 111 P.3d 1019, 1019 (2005) (holding that, under Arizona law, a school district is not contractually bound when it has accepted a construction bid but has not yet executed a written contract), *with Safeco Ins. Co. of Am. v. City of White House,* 36 F.3d 540, 547 (6th Cir.1994) (holding that, under Tennessee law, a contract was formed when defendant accepted bid), and *United States v. Nat'l Optical Stores Co.,* 407 F.2d 759, 760–61 & n. 3 (7th Cir.1969) (holding that when government accepted defendant's bid, "a binding contract was then formed" under federal common law, where the bid invitation stated that "the Bid when accepted by the Government, shall constitute an agreement for sale between the successful bidder and the Government").

**10.** The Court also notes that Plaintiff did not explicitly allege that the NYCTA bid was a contract in its Complaint, but only in its opposition papers.

*Manitou Mineral Water, Inc.*, 665 F.Supp.2d 239, 255 (S.D.N.Y.2009) (denying leave to amend tortious interference with contract claim that had been dismissed because plaintiffs stated only that "defendants interfered with their customer contracts," but did not "specify a single customer contract with which defendants interfered"); *Berman v. Sugo LLC*, 580 F.Supp.2d 191, 208 (S.D.N.Y.2008) (dismissing claim that merely alleged that a contractual relationship with a third party existed, but set forth no facts about the type of contract, whether it was nonexclusive, and whether it was valid). Second, Plaintiff does not allege that Defendants took any actions towards third parties with which Plaintiff allegedly had contracts. *See B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F.Supp.2d 474, 485 (S.D.N.Y.2010) ("The defendant's interference must be direct: the defendant must direct some activities towards the third party . . . ." (internal quotation marks and citation omitted)); *Boehner v. Heise*, 734 F.Supp.2d 389, 404–05 (S.D.N.Y.2010) ("Plaintiffs must show Defendants' direct interference with a contract. That is, Defendants must have directed some activities toward the customers whose contracts are alleged to have been breached."); *Lama*, 646 N.Y.S.2d 76, 668 N.E.2d at 1376 (dismissing tortious interference with contract claim because plaintiff made no allegation that defendant intentionally procured third-party's breach of its contract with plaintiff). Third, Plaintiff does not allege that any third party breached its contract, but instead alleges that *Plaintiff* breached its contracts with third parties as a result of CPS's alleged breaches of the Agreement. Such an allegation is insufficient. *See Berman*, 580 F.Supp.2d at 207–08 (dismissing counterclaim which only stated that defendant "lost the contract" with a third party, where defendant did not allege that the *third party* breached the contract); *see also Lama*, 646 N.Y.S.2d

76, 668 N.E.2d at 1376 (noting that tortious interference with contract claim was deficient because plaintiff did not allege that the defendant "intentionally procured [the third party]'s breach of its contract with [plaintiff]," or that the third party breached its contract with plaintiff). Fourth, "[h]aving failed sufficiently to allege actual breach, it follows that [Plaintiff has] not alleged facts sufficient to fulfill [the] third element, procurement of the third-party's breach of the contract without justification." *Kirch*, 449 F.3d at 402 n. 6.

These deficiencies are fatal to Plaintiff's claim of tortious interference with contract, and the claim is dismissed. *See Dune Deck Owners Corp. v. Liggett*, 85 A.D.3d 1093, 927 N.Y.S.2d 125, 128 (2011) (dismissing tortious interference with contract claim where "plaintiff failed to plead the existence of a valid contract between the plaintiff and a third party, and that the defendant intentionally procured the third party's breach of that contract without justification" (alteration and internal quotation marks omitted)).

### E. Fifth Cause of Action: Tortious Interference with Existing Business Relationships

The fifth cause of action alleges that CPS tortiously interfered with Plaintiff's business relations by "institut[ing] increasingly onerous and unnecessary business constraints." (Am. Compl. ¶ 108.) Plaintiff alleges that these operational constraints, including the bidding prohibition and alteration of Plaintiff's payables status to COD fulfillment only, were "done with malice, in an attempt to drive [Plaintiff] and other competitors from the municipal marketplace." (*Id.* ¶¶ 109–13.)

■ To state a claim for tortious interference with business relations, Plaintiff must allege that: "(1) the plaintiff had

business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir.2008). " '[C]onduct constituting tortious interference with business relations is, by definition, conduct, directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.' " *Armored Grp., L.L.C. v. Homeland Sec. Strategies, Inc.*, No. 07–CV–9694, 2009 WL 1110783, at *2 (S.D.N.Y. Apr. 21, 2009) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100, 1104 (2004)).

■■■ There are several fatal deficiencies in Plaintiff's cause of action for tortious interference with existing business relationships. First, Plaintiff has not adequately alleged any *specific* existing business relationships with which Defendant interfered, but only its business relationships in general. Such a generic claim does not suffice. *See AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*, No. 02–CV–1363, 2003 WL 21203503, at *6 (S.D.N.Y. May 22, 2003) (noting that "[a] properly pleaded complaint ... must allege relationships with specific third parties with which the respondent interfered"); *Four Finger Art Factory, Inc. v. Dinicola*, No. 99–CV–1259, 2000 WL 145466, at *7 (S.D.N.Y. Feb. 9, 2000) (dismissing tortious interference with business relations claim where "the complaint fail[ed] to identify any other relationships with any other specific parties with which the defendants interfered"); *Envirosource, Inc. v. Horsehead Res. Dev. Co.*, No. 95–CV–5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996) (noting that "[a] general allegation of interference with customers without any sufficiently particular allegation of interference with a *specific contract or business*

*relationship* will not withstand a motion to dismiss" (emphasis in the original) (internal quotation marks omitted)).

Second, Plaintiff only alleges conduct directed at itself, not conduct directed at its customers. For example, Plaintiff alleges that CPS "instituted increasingly onerous and unnecessary business constraints" on Plaintiff, (Am. Compl. ¶ 108), but other than its communications with NYCTA over bid number 76037, Plaintiff does not allege any actions directed towards Plaintiff's customers. This also is fatal to Plaintiff's Complaint. *See Noonan*, 785 N.Y.S.2d 359, 818 N.E.2d at 1104 ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."); *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir.1995) (affirming dismissal of tortious interference with business relations claim because plaintiffs made no allegations that defendants had any contact or intentionally interfered with plaintiffs' customers); *Armored Group*, 2009 WL 1110783, at *3 (dismissing tortious interference with business relations claim where plaintiff alleged that because of defendant's breach, plaintiff's relationship with its clients had been "irreparably damaged," but nowhere alleged that defendants directed any conduct at plaintiff's clients).

Further, Plaintiff has not pleaded interference with business relations based on CPS's communications with NYCTA regarding bid number 76037. While Plaintiff does incorporate all previous paragraphs into the section stating a tortious interference with business relations cause of action, (Am. Compl. ¶ 106), several of which discuss CPS's communications with NYCTA, (*id.* ¶¶ 30–33), the cause of action section itself actually focuses on CPS's

bidding prohibition and the switch from preferred credit to COD, (*id.* ¶¶ 109–10). "[G]iven that Plaintiff is represented by counsel, the Court has no obligation to construe its Complaint liberally," *Giovelli v. LA Fitness, Inc.*, No. 10–CV–298, 2010 WL 415289, at *1 (E.D.N.Y. Jan. 28, 2010), and the Court finds that because Plaintiff has not referenced CPS's communications with NYCTA in the cause of action itself, it has not adequately alleged tortious interference with business relations on this ground. *See, e.g., Walonoski v. Goodrich Pump & Engine Control Sys., Inc.*, No. 07–CV–00198, 2007 WL 3226181, at *5 (D.Conn. Oct. 30, 2007) (dismissing cause of action which simply stated that the preceding paragraphs were incorporated herein, and did not "allege any material fact that gives Defendant notice of the claim against it, thereby failing to satisfy the liberal pleading requirements of Rule 8(a)"); *BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F.Supp.2d 968, 992–93 (S.D.N.Y.2003) (dismissing claim without prejudice where plaintiff did not adequately allege breach in the cause of action section of its complaint, but arguably alleged facts that could show a breach in that section's incorporated paragraphs).

The Court notes that it appears from the Complaint that Plaintiff could have plausibly alleged that it had business relations with NYCTA in the form of bid number 76037, that CPS interfered with those business relations, that CPS's acts injured the relationship, and that CPS did so "for the sole purpose of inflicting intentional harm on [Plaintiff]." *Noonan*, 785 N.Y.S.2d 359, 818 N.E.2d at 1104 (internal quotation marks omitted); *see also Catskill Development*, 547 F.3d at 137 (same). Plaintiff's tortious interference with business relations claim is therefore dismissed without prejudice.

### F. Sixth Cause of Action: Donnelly Act

The sixth cause of action alleges that CPS violated the Donnelly Act. (Am. Compl. ¶ 121.) Specifically, Plaintiff alleges that in the fall of 2009, "CPS undertook a scheme to eliminate the bulk of its competition with respect to revenue based transit contracts in the municipal marketplace," by instructing Plaintiff and several other key dealers to cease bidding on contracts in this marketplace. (*Id.* ¶ 119.) Plaintiff alleges that the purpose of this arrangement was "to permit CPS to eliminate competition and/or restrain trade in the municipal marketplace" with respect to revenue based contract for its engines and engine parts. (*Id.* ¶ 122.) Plaintiff claims that these actions have subjected Plaintiff's customers to unfair practices, and forced the public and its agencies "to incur unnecessary cost burdens." (*Id.* ¶ 123.)

 "A party asserting a violation of the Donnelly Act must (1) identify the relevant product market, (2) describe the nature and effects of the purported conspiracy, (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question, and (4) show a conspiracy or reciprocal relationship between two or more entities." *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F.Supp.2d 657, 678 (S.D.N.Y.2002). The standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act. *See Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n. 2 (2d Cir.2011) ("The Donnelly Act, New York's antitrust statute, was modeled on the Sherman Act and has generally been construed in accordance with federal precedents."); *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357, 359 (1976) (noting that Donnelly Act "has been con-

sidered to have been modeled after the Sherman Act").

■ To survive a motion to dismiss, a Donnelly Act claim must "include specific, factual allegations as to the identities of the co-conspirators, the nature of their conspiracy, how the participants attempted to accomplish their objectives, and what overt acts they performed. Unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects [do] not meet the minimum standards of pleading a conspiracy" under the antitrust laws. *Tese–Milner v. Diamond Trading Co., Ltd.*, No. 04–CV–5203, 2011 WL 4501336, at \*5 (S.D.N.Y. Sept. 29, 2011) (alterations, citations, and internal quotation marks omitted); *see also Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 103 (2d Cir.2000) (noting that an anti-trust plaintiff "must allege a combination or some form of concerted action between at least two legally distinct economic entities" (internal quotation marks omitted)).

■ Plaintiff has not plausibly alleged a Donnelly Act conspiracy between Defendants and other companies, because it has not "include[d] specific, factual allegations as to the identities" of the other alleged co-conspirators. *Tese–Milner*, 2011 WL 4501336, at \*5 (internal quotation marks omitted). Instead, Plaintiff merely alleges that "several of [CPS's] other key dealers" were instructed to cease bidding on contracts, and that they were "coerced into entering into agreements with CPS in restraint of trade." (Am. Compl. ¶¶ 119, 121.) Plaintiff's Donnelly Act claim, to the extent it alleges a conspiracy between Defendants and other, unspecified companies, therefore is dismissed. *See Kahn v. iBiquity Digital Corp.*, No. 06–CV–1536, 2006 WL 3592366, at \*5 (S.D.N.Y. Dec. 7, 2006) (dismissing antitrust claim because "plaintiffs have not offered any specifics about illicit meetings between the defendants or

of a mutual plan between them to restrain interstate trade, nor have plaintiffs offered specific acts of conspiracy connected to any specific defendant"), *aff'd*, 309 Fed. Appx. 429 (2d Cir.2009); *Mathias v. Daily News, L.P.*, 152 F.Supp.2d 465, 484 (S.D.N.Y.2001) (dismissing Sherman Act claim, in part because plaintiff gave "no information as to the identities of the co-conspirators, the nature of their conspiracy, how the participants attempted to accomplish their objectives, and what overt acts, if any, they performed towards the fulfillment of their conspiracy").

However, Plaintiff also has alleged a conspiracy between itself and CPS. Specifically, Plaintiff has alleged that after CPS told it to stop bidding, Plaintiff "thought that it had no alternative but to comply . . . and did, in fact, refrain from bidding on a select number of contracts as CPS had directed." (Am. Compl. ¶ 38.) While "[s]hortly thereafter" Plaintiff "once again began bidding," (*id.* ¶ 39), it has nonetheless alleged a conspiracy between Defendants and itself for that brief period of time. "The fact that the only parties to the alleged illegal activity in this case are the plaintiff and the defendant does not preclude an action under" the Donnelly Act, *George Miller Brick Co. v. Stark Ceramics, Inc.*, 9 Misc.3d 151, 801 N.Y.S.2d 120, 127 (Sup.Ct.2005); *see also Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 16, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) (holding that under the Sherman Act "[t]here is actionable wrong whenever the restraint of trade or monopolistic practice has an impact on the market; and it matters not that the complainant may be only one merchant"). Plaintiff may bring this claim despite its own participation in the conspiracy, because it is plausible for Plaintiff to allege that it did not bear "at least substantially equal responsibility for the violation." *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299,

308–09, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (noting that in antitrust litigation, a plaintiff cannot sue where it "truly bore at least substantially equal responsibility for the violation" (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 146–49, 153, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968))); *see also Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1090 (2d Cir. 1997) (noting that *in pari delicto* defense "is used sparingly" and only applies "where the plaintiff has participated in some of the same sort of wrongdoing as the defendant," and courts "should not allow the defense unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater" (citation and internal quotation marks omitted)); *Koch Indus. Inc. v. Aktiengesellschaft*, 727 F.Supp.2d 199, 212 (S.D.N.Y.2010) ("Under the Second Circuit's approach," plaintiffs are barred by in pari delicto from suing co-conspirators "when the following two elements are present: (1) 'as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress,' and (2) public policy considerations favor applying the defense." (quoting *Peltz*, 115 F.3d at 1090)).

■ However, to survive Defendants' motion to dismiss, Plaintiff must adequately allege a relevant product market. The Second Circuit has described this burden as follows:

The relevant market must be defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level. Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant

market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient.

*City of New York v. Group Health Inc.*, 649 F.3d 151, 155–56 (2d Cir.2011) (alteration, citations, and internal quotation marks omitted); *see also Shepard Indus., Inc. v. 135 E. 57th St., LLC*, No. 97–CV–8447, 1999 WL 728641, at *3 (S.D.N.Y. Sept. 17, 1999) ("[I]f a complaint does not allege facts regarding substitute products, distinguish among apparently comparable products, or allege other pertinent facts relating to cross-elasticity of demand, a court may grant a Rule 12(b)(6) motion."). Plaintiff must not only allege facts regarding interchangeability of products and cross-elasticity of demand, it must also identify the relevant geographic market. *See Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc.*, 34 A.D.3d 91, 823 N.Y.S.2d 79, 83 (2006) ("Identification of a relevant market must include all products that are reasonably interchangeable and all geographic areas in which such reasonable interchangeability occurs." (alteration and internal quotation marks omitted)). While "a single brand of a product or service" can be a relevant market, "one brand does not *necessarily* constitute a relevant market if substitutes are available." *Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451, 481–82 & n. 30, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original). Here, the market is determined "by the choices available" to Cummins equipment owners and/or users, and whether Cummins parts and service are "interchangeable with other manufacturers' service and parts." *Id.* at 482, 112 S.Ct. 2072.

■ In its Amended Complaint, Plaintiff has failed to adequately allege the relevant product market. At one point in its

Amended Complaint, Plaintiff alleges that the relevant product market is revenue-based contracts for Cummins engines and engine parts in the municipal marketplace, and that these are the only such products that meet unspecified EPA standards. (Am. Compl. ¶¶ 9, 122.) However, Plaintiff elsewhere describes Defendants' scheme as directed at "all MTA and NYCTA Requests for Bids covering machine components for buses," without describing what components were included in this scheme, or their EPA compliance. (*Id.* ¶¶ 34, 36–37.) These conflicting statements leave the Court unclear as to whether the relevant product market is contracts with *all* municipal agencies, or contracts with MTA and NYCTA alone.[11] Moreover, Plaintiff also alleges that although it initially obeyed CPS's bidding prohibition, it later decided to resume bidding in the municipal marketplace, beginning with an NYCTA bid request for injectors manufactured by Bosch. (*Id.* ¶¶ 38–40.) Plaintiff claims that while it "normally would have obtained the Bosch injectors from CPS," as a result of the bidding prohibition Plaintiff "instead obtained the injectors directly from Bosch." (*Id.* ¶ 41.) These allegations create further confusion as to the product market, namely whether Plaintiff alleges a product market comprised of *all* machine components for buses (including those made by Bosch), or merely those engines and engine parts manufactured by Cummins.

Given these unclear allegations, Plaintiff has neither adequately defined a relevant product market, nor provided "a plausible explanation as to why a market should be limited in a particular way." *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir.2001) ("Cases in which dismissal on the pleadings is appropriate frequently involve ei-

ther (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.") (footnote omitted) (collecting cases). While Plaintiff hints that some of the products at issue are unique (by virtue of their EPA compliance), "[m]erely asserting that a commodity is in some way unique is insufficient to plead a relevant market." *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162, 171 (S.D.N.Y.1995); *see also Conte v. Newsday, Inc.,* 703 F.Supp.2d 126, 142–43 (E.D.N.Y.2010) (dismissing complaint where plaintiff made "no effort to explain the alleged market with reference to the interchangeability of the product at issue").

Furthermore, Plaintiff has not identified which particular engines or engine components are at issue, let alone whether there are any interchangeable alternatives or why the market should be as narrow as Plaintiff (in the alternative) suggests. *See AF Gloenco Inc. v. Ushers Mach. & Tool Co.,* No. 10–CV–1128, 2011 WL 4593741, at *2 (N.D.N.Y. Sept. 30, 2011) (holding that definition of relevant market as "the manufactured parts derived from General Electric Company" was insufficient, as defendant failed to "articulate a geographic boundary for the market," or discuss "any possible substitutes, or the lack thereof, for the products included within" (alteration omitted)); *Polargrid LLC v. Videsh Sanchar Nigam Ltd.,* No. 04–CV–9578, 2006 WL 2266351, at *6 (S.D.N.Y. Aug. 7, 2006) (dismissing Sherman Act claim because plaintiff's complaint "refers merely to 'fiber optic bandwidth,' without any ex-

---

**11.** It is clear that MTA and NYCTA are not the only municipal agencies in the marketplace, as Plaintiff states that its customers also "in-

clud[ed] public agencies such as [NYSDOT]." (Am. Compl. ¶ 6.)

planation of what this market consists of, its geographic scope, or whether its constituent elements are interchangeable so as to qualify as a market under the antitrust laws"); *B.V. Optische*, 909 F.Supp. at 172 (rejecting plaintiff's allegation that "chest equalization radiography" was relevant market because plaintiff had not addressed "any reasonably interchangeable alternatives").

And, finally, Plaintiff has said nothing about the geographic boundaries of the product market. While reference is made in the Amended Complaint to various New York State city and state agencies, Plaintiff has made no particular claim about what geographic region is at issue. *See Mathias v. Daily News, L.P.*, 152 F.Supp.2d 465, 483 (S.D.N.Y.2001) (dismissing Sherman Act claim where there was "no clear indication from the complaint as to a precise geographic market" because plaintiffs' "only allegations that resemble[d] a geographic market discussion [were] contradictory": "[a]t times, [plaintiffs] appeared to advance a narrow, 'tri-state area' market," but plaintiffs' "descriptions of [defendant's] operations indicated a broader national market"); *see also In re Time Warner Inc. Set–Top Cable Television Box Antitrust Litig.*, 08–CV–7616, 2010 WL 882989, at *9 (S.D.N.Y. Mar. 5, 2010) (noting that plaintiffs should "allege in any further amended pleading" whether the relevant services were available in certain geographic markets, because if the services "are available in some geographic markets and not in others, it is incumbent upon plaintiff to plausibly define those geographic markets or submarkets").

Therefore, for the aforementioned reasons, this cause of action is dismissed without prejudice. *See Polargrid LLC*, 2006 WL 2266351, at *6 ("Failure to adequately plead a relevant well-defined market requires dismissal of a complaint."); *see also*

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238–39 (2d Cir.2008) (affirming dismissal of antitrust claim because definition of market as "restraint training services to private child care providers located within the State of New York" was too narrow, as plaintiff failed to show how the market to child care providers was "any different from the larger market for restraint training services to other businesses, agencies, and organizations"); *Boczar v. Manatee Hosps. & Health Sys., Inc.*, 731 F.Supp. 1042, 1046–47 (M.D.Fla.1990) (dismissing Sherman Act claim because plaintiff "[did] not allege the product or geographic market," where "complaint [was] contradictory," alleging that defendant's facility provided "the only obstetrical beds in Manatee County," while also alleging that patients were taken to a different facility, which suggested that defendant "[did] not actually monopolize the relevant geographic market"). Plaintiff may, if it wishes, amend its Complaint to properly allege "its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Group Health Inc.*, 649 F.3d at 155; *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir.1999) (granting plaintiffs "leave to amend their complaint to allege anticompetitive effects within a particular market," where they referred to a geographic market and product markets, but did not allege that the geographic market was "the area of effective competition in which buyers of these products [could] find alternative sources of supply, or that there [were] no other goods or services that [were] reasonably interchangeable ... within this geographic market").

### G. Causes of Action against Cummins

Plaintiff alleges that it has apprised Cummins of CPS's actions, and Cummins has failed "to direct that CPS enter into a

proper conduct [of] business." (Am. Compl. ¶¶ 61–63.) In all six causes of action, Plaintiff broadly alleges that Cummins "has both the corporate and contractual authority to control the actions of CPS," knew of CPS's wrongful activity, and therefore participated in CPS's wrongful actions "[b]y its activity or failure to act." (*Id.* ¶¶ 72–73, 80–81, 89, 103–104, 114–15, 124–25.) Plaintiff clarifies in its opposition papers that it seeks to pierce the corporate veil of Cummins on an alter ego theory, and also to hold Cummins directly liable for "actively collud[ing] with CPS in an anti-competitive and illegal matter." (Mem. of Law in Opp'n to Cummins' Mot. to Dismiss ("Opp'n to Cummins") 6–7, 12.)

### 1. Direct Liability

Plaintiff claims that it has adequately alleged in its Amended Complaint that Cummins "actively participated in an intentional scheme with CPS to convert the business relationships of National and others into a monopolistic, conspiratorial and anti-competitive model." (*Id.* at 12–13). However, the referenced paragraphs in the Amended Complaint merely allege that Cummins failed "to direct that CPS enter into a proper conduct of [ ] business" with Plaintiff. (Am. Compl. ¶ 67). Nowhere does the Amended Complaint allege any unlawful conduct by Cummins, other than this "failure or refusal" to act. (*Id.* ¶¶ 63–68, 117–28.) The Court therefore has only Plaintiff's conclusory statements in its

Memorandum of Law that Cummins "actively participated in an intentional scheme." (Opp'n to Cummins 12.) Without any supporting facts, this claim is not "plausible on its face," and must be dismissed. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (holding that to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level").

### 2. Alter Ego/Veil Piercing Theory

Plaintiff's claims against Cummins under the alter ego theory fail as well.[12] Plaintiff asserts that Cummins "has both the corporate and contractual authority to control the actions of CPS." (Am. Compl. ¶ 125.) In support of this claim, Plaintiff alleges that: (1) Cummins is the beneficial owner of 82% of CPS's voting shares and was therefore familiar with CPS's business practices and policies and dealings with third parties, (*id.* ¶¶ 4–5); (2) Cummins created the form used in the Agreement, which was the standard form used by all Cummins distributors, (*id.* ¶ 11); (3) Cummins was a third-party beneficiary of the Agreement, (*id.* ¶ 12); (4) the Agreement provided that it could be assigned to Cummins upon written notice to Plaintiff, (*id.* ¶ 13); (5) the addendum to the Agreement is entitled "Cummins Inc.: Minimum Insurance Requirements," (*id.* ¶ 14); (6) CPS was able to cut off Plaintiff's access to Cummins' computer-based ordering system, (*id.* ¶ 56); (7) Plaintiff has experienced substantial delays in the manufac-

---

**12.** The Court looks to Delaware law to address the alter ego/veil piercing theory, as CPS is a Delaware limited liability company. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 132 (2d Cir.1993) (holding that under New York choice of law principles, "[t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders"); *see also In re Alper Holdings USA, Inc.,* 398 B.R. 736, 757 (Bankr.S.D.N.Y.2008) (holding that under New York choice of law principles, since both parties are incorporated

in Delaware, Delaware law controls the "alter ego/veil piercing analysis"); *Sofi Classic S.A. de C.V. v. Hurowitz,* 444 F.Supp.2d 231, 240 (S.D.N.Y.2006) (noting that "because the purpose of state corporation law is to insulate shareholders from legal liability, the state of incorporation has the paramount interest in determining when and if that insulation is to be stripped away [and] [t]herefore the general rule is that the law of the state of incorporation determines when the corporate form will be disregarded" (citation and internal quotation marks omitted)).

turing and delivery of Cummins parts for its orders, (*id.* ¶ 57); and (8) CPS and Cummins shared the email address "@cummins.com," (*id.* Ex. E).[13]

■■■■ "To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness" is present. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir.1995) (internal quotation marks omitted); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir.2008) (holding that "plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness" (internal quotation marks omitted)).[14] Some combination of the following factors normally is considered:

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*NetJets*, 537 F.3d at 177 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV. A. 1331, 1989 WL 110537, at *4 (Del.

Ch. Sept. 19, 1989)); *see also Wilson v. Thorn Energy, LLC*, 787 F.Supp.2d 286, 295 (S.D.N.Y.2011) (same). " '[T]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a single formula that is neither over- nor under-inclusive.' " *NetJets*, 537 F.3d at 177 (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del.Ch.1987)). Still, "a plaintiff seeking to persuade a Delaware court to disregard corporate structure faces a difficult task." *Id.* at 176 (internal quotation marks omitted).

■■■■ Plaintiff does not allege a single fact that addresses these factors, thus mortally wounding its claims against Cummins. *See Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir.1998) (affirming dismissal of plaintiff's claim against parent company under similar New York standard for piercing the corporate veil, where plaintiff's complaint alleged no facts that could establish a basis for piercing the corporate veil); *Kertesz v. Gen. Video Corp.*, No. 09–CV–1648, 2010 WL 5422524, at *3 (S.D.N.Y. Dec. 23, 2010) (rejecting plaintiff's attempts to pierce the corporate veil, because plaintiff's allegations "fail[ed] to address most of the factors relevant to the determination of alter ego status"); *Waite v. Schoenbach*, No. 10–CV–3439, 2010 WL 4456955, at *4 (S.D.N.Y. Oct. 29, 2010) (dismissing alter ego claim because plaintiff's "unsupported assertions" that owners and officers of one company "exercised complete dominion and control" over other company, "that

---

**13.** At oral argument, for the first time, Plaintiff argued that Paragraph B of the Agreement's Preamble shows that Cummins had complete control and domination over CPS. This is a surprising claim, given that Paragraph A of the Agreement states that CPS is "an independent corporation." (Am. Compl. Ex. A, ¶ A.)

**14.** The fact that CPS is a limited liability company does not change the analysis. *See*

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir.2008) ("Given the similar liability shields that are provided by corporations and LLCs to their respective owners, [e]merging caselaw illustrates that situations that result in a piercing of the limited liability veil are similar to those [that warrant] piercing the corporate veil." (internal quotation marks omitted)).

companies operate at the same location and share employees, officers, owners, and bank accounts," and that companies "shift money and assets between themselves in an effort to defraud creditors," were "insufficient to pierce the corporate veil" (internal quotation marks omitted)); *Kalin v. Xanboo, Inc.,* 526 F.Supp.2d 392, 404 (S.D.N.Y.2007) (allegations of a common address, common ownership, and common principals, without more, are insufficient to plead piercing the corporate veil). The claims against Cummins, under both direct liability and alter ego liability, are dismissed.[15]

### III. Conclusion

For the foregoing reasons, CPS's motion to dismiss Plaintiff's claims against it is granted, and the claims are dismissed

without prejudice. *See Stern v. Gen. Elec. Co.,* 924 F.2d 472, 477 (2d Cir.1991) ("[D]ismissals for insufficient pleadings are ordinarily with leave to replead...").

For the foregoing reasons, Cummins' motion to dismiss Plaintiff's claims against it is granted, and the claims as to Cummins are dismissed without prejudice as well.

The Clerk is respectfully requested to terminate the pending motions. (Dkt. Nos. 47, 49.) If Plaintiff wishes to file a Second Amended Complaint, it must do so within thirty days.[16]

SO ORDERED.

---

**15.** The Court also notes Section 9.2 of the Agreement: "[CPS] and Cummins are Independent. [Plaintiff] acknowledges that [CPS] is independently incorporated with different ownership than Cummins and without the authority to speak for or legally bind Cummins." (Am. Compl. Ex. A, § 9.2.)

**16.** The Court notes that Plaintiff neglected to cite in its Complaint, or incorporate by reference, many documents that it included in its papers filed in relation to its motion for a preliminary injunction, such as the affidavit of Karl F. Gontkof, Vice President of CPS's Engine Business. (Pl.'s Mem. of Law in Supp. of its Mot. for a Prelim. Inj. Ex. A (Dkt. No. 10).) In it, Gontkof states that "[p]rior to April 2008, CMPS had a distributor-dealership type of relationship with Plaintiff," which CPS then continued "pursuant to the terms of an unsigned Cummins Engine Dealership Agreement." (*Id.*) Another example is the affidavit of Pat Luongo, Plaintiff's Comptroller, which includes transcripts of recorded telephone conversations where CPS employees discussed the alleged bidding prohibition. (Aff. of Pat Luongo in Supp. of Pl.'s Mot. for a Prelim. Inj. (Luongo Aff.) (Dkt. No. 14).) An excerpt from the transcript of a November 30, 2009 recorded telephone conversation between Luongo and Rick Kisylia, Automotive Sales Manager of CPS, reveals the following:

Pat: Uhh, okay, but now your [sic] telling me that I'm not supposed to quote the transit authority at all.
Ricky: Revv, the the revenue side of the business, new parts and recon parts, we don't want you bidding.
Pat: New parts or recon parts, what other parts are there, there are none, no.
Ricky: Uhh um I'm just sayin that that's the two things that we are trying to grow our profits on so that we can afford to do things.
Pat: Yeah, yeah but Ricky I busted my chops building this up.
Ricky: I'm just telling you we got new players and we got new vice president, we have a new owner, and their philosophy is, an and we're just listen, and we're tying [sic] to get there, and we're getting there uhhh, but that business is is uhh for us, and that's what's going to support the New York City bus business, now.
....
Pat: But ok, like last Thursday last Wednesday there were 4 bids that I was ready to bid on, an and because of what you told, I didn't bid on them now.
Ricky: Thanks you, I appreciate it.
Pat: But, now, there.
Ricky: It went a long way with two guys tha that you met with because I shared with them that uh, you got, you and a couple of other people were not bidding it, and you

know something, none of you bidded, so you did what you said you were gonna do, and that, that goes a long way.

(Luongo Aff., Ex. A.)

Also of note is a March 30, 2010 recorded telephone conversation between Luongo and Kristy Kibler of CPS:

Pat: ... uhh there's a bid for Cummins parts, you, you don't want us to bid on that one.

Kristy: The recon.

Pat: Yeah, I think so, you you going in on that uhh.

Kristy: I uhh for New York City.

Pat: Yeah, no.

Kristy: Yeah, yeah.

Pat: For the transit.

Kristy: Yes.

Pat: Okay, alright then, so you want us to stay out of it ...

...

Pat: Now, now on the other, on the huhh I, I keep getting a call that they want us to

quote for sure, so I, I'm going to go in at list price.

Kristy: Youu [sic], okay, that's fine, I mean, you, you do it, do what you have to do that's fine.

Pat: Alright, I'll go in at list price and huhh, okay, huhh, that's what you want us to do I presumed.

Kristy: I can't tell ya, I mean, I know you meet [sic] with Scott and Karl and uhhh, I mean, you know, I think, that umm you know how we want that business to run, but I can't tell you over the phone, so I know, I mean, to be honest with you, umm, you know I, I just know what our company policy is right, but you know I, Its [sic], you do what you need to do, I, I think that its [sic] . in your best interest to you know, remember what they talked to you about, you know what I mean, but I, I don't know what to say besides that ...